**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS AT KANSAS CITY**

| | |
|---|---|
| STEVE DEITSCH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BERMAN & RABIN, P.A. and DOES I through X,<br><br>Defendants. | Case No.: 2:25-CV-2067<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Steve Deitsch ("Plaintiff"), by and through his undersigned counsel, brings this Class Action Complaint against Defendant Berman & Rabin, P.A. ("Defendant") and Does I through X individually and on behalf of all others similarly situated, and alleges as follows, based upon personal knowledge as to himself, and upon information and belief as to all other matters.

**INTRODUCTION**

1. Plaintiff brings this action on behalf of himself and all other similarly situated victims as a result of a recent cybersecurity and data breach incident.

2. In July 2024, a criminal actor targeted and gained access to Defendant's network and stole Plaintiff and the class's name, Social Security number, date of birth, and financial information ("the Data Breach").

3. In February of 2025, Plaintiff received a notice from Defendant advising him that his personal identifying information ("PII") was subject to the breach.

4. The attack was targeted. Because Plaintiff's sensitive information, including his Social Security number, is in the hands of criminals, it has already been misused. And the

information at issue is inherently sensitive.

5. Plaintiff never shared his PII with Defendant. Rather, Defendant is a debt collector who was collecting a debt on behalf of a different creditor named here as a Doe Defendant. The Doe Defendants are credit card companies or other creditor entities which provided Defendant with Plaintiff and the putative class's PII.

6. Plaintiff and other individuals impacted by the Data Breach are now at serious risk of continuing injury caused by the theft of their personal identifying information ("PII"), which, upon information and belief, is in the possession of cybercriminals seeking to profit from it.

7. Defendant and the Doe Defendants are responsible for the Data Breach because it failed to implement and maintain reasonable safeguards to protect Plaintiff and the class's PII. Defendant knew better as its business relies on handling sensitive information.

8. Plaintiff brings this action, on behalf of himself and those similarly situated, to seek redress for the lifetime of harm they will now face, including reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, and the costs of extended credit monitoring services and identity-theft insurance.

9. Plaintiffs further seek injunctive relief requiring Defendant to implement and maintain reasonable data security practices going forward.

**PARTIES**

10. Plaintiff Deitsch is a resident and citizen of Billings, Montana.

11. Defendant Berman & Rabin, P.A. is a Kansas debt collection law firm with its principal place of business in Overland Park, Kansas.

12. Doe Defendants I through X are creditor entities unknown at this time who provided Defendant Berman & Rabin, P.A. with Plaintiff and the putative class's PII and are correspondingly liable for the Data Breach.

## JURISDICTION & VENUE

13. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in which at least one member of the Class is a citizen of a state different from Defendant, the amount in controversy exceeds $5 million exclusive of interest and costs, and the proposed Class contains more than 100 members.

14. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and (c)(2) because a substantial part of the events or omissions giving risk to the claim occurred here and Defendant is subject to this Court's personal jurisdiction. Among other things, Defendant is headquartered in this District, conducts substantial business operations in this District, and purposely availed itself of the benefits of the Court's jurisdiction.

## FACTUAL ALLEGATIONS

15. Defendant is a debt collector. As such, it collects PII in the course of doing business.

16. Upon information and belief, Defendant promises to maintain the confidentiality of Plaintiff's and the putative class's PII and to comply with federal and state laws and regulations related to data privacy, and not to use or disclose the PII of Plaintiff or the putative class.

17. On January 28, 2025, Defendant informed Plaintiff and the putative class via a Notice of Data Breach letter that on or about July 8, 2024, it identified suspicious activity on certain computer system and determined that from July 5 through 8, 2024, a criminal actor gained access to its system and secured highly sensitive PII including names, Social Security numbers and financial information of Plaintiff and the putative class.

18. Defendant waited over 6 months to inform regulators, Plaintiff or the putative class of the Data Breach, thus depriving them of the opportunity to take timely preventative measures.

19. Plaintiff, upon learning of the breach, spent several hours of time at his own expense checking his credit reports, alerting his bank, and otherwise investigating how Defendant compromised his PII.

20. Defendant was obligated to keep Plaintiff's and putative class members' PII confidential and protect it from unauthorized access and disclosure.

21. Due to Defendant's inadequate security measures, Plaintiff and the putative class now face a present, immediate and ongoing risk of fraud and identity theft and must deal with the threat forever.

22. Defendant was required to safeguard Plaintiff's and the putative class's PII because it is sensitive, valuable, and its release to criminal third parties would alter the substantive rights of Plaintiff and the putative class over their own information and to manage their vulnerability to crime.

23. Defendants' purpose is maintaining the information was to conduct its debt collection business. Thus, the information's unauthorized transfer to a criminal third party (or, by now, potentially many other criminal third parties) is inherent misuse of the information. Criminal third parties generally do not steal information with any purpose other than to misuse it.

24. Upon information and belief, the PII was not encrypted prior to the Data Breach.

25. Defendant should have had strong protections in place to detect and terminate a successful intrusion long before access and exfiltration of PII.

26. It is well-known that use of stolen credentials has long been the most popular and effective method of gaining unauthorized access to a company's internal networks and that organizations should activate defenses to prevent such attacks.

27. According to the FBI, phishing schemes designed to induce the disclosure of user credentials were the most common type of cybercrime in 2020, with such incidents nearly doubling in frequency between 2019 and 2020.[1]

28. According to Verizon's 2021 *Data Breach Investigations Report*, 43% of breaches stemmed from phishing and/or pretexting schemes.[2]

29. There are two primary ways to mitigate the risk of stolen credentials: user education and technical security barriers. User education is the process of making employees or other users of a network aware of common disclosure schemes and implementing company-wide policies requiring the request or transfer of sensitive personal or financial information only through secure sources to known recipients.

30. For example, a common phishing e-mail is an "urgent" request from a company "executive" requesting confidential information in an accelerated timeframe. The request may come from an e-mail address that appears official but contains a different number or letter. Other phishing methods include baiting a user to click a malicious link that redirects them to a nefarious website or download an attachment containing malware.

31. User education provides the easiest method to assist in properly identifying fraudulent "spoofing" e-mails and prevent unauthorized access of sensitive internal information.

---

[1] FBI INTERNET CRIME COMPLAINT CTR., https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf (last visited Sept. 28, 2023).

[2] VERIZON, https://www.verizon.com/business/resources/reports/dbir/2021/masters-guide/ (subscription required) (last visited Sept. 28, 2023).

According to September 2020 guidance from the Cybersecurity and Infrastructure Security Agency ("CISA"), organizations housing sensitive data should "[i]mplement a cybersecurity user awareness and training program that includes guidance on how to identify and report suspicious activity" and conduct "organization-wide phishing tests to gauge user awareness and reinforce the importance of identifying potentially malicious emails."[3]

32. From a technical perspective, companies can also greatly reduce the flow of phishing e-mails by installing software that scans all incoming messages for harmful attachments or malicious content and implementing certain security protocols governing e-mail transmissions, including Sender Policy Framework ("SPF"), DomainKeys Identified Mail ("DKIM"), and Domain-based Message Authentication, Reporting and Conformance ("DMARC").

33. Additionally, because the goal of many phishing attempts is to gain an employee's login credentials in order to access a company's network, there are industry-standard measures that companies can implement to greatly reduce unauthorized access—even if a phishing attempt is successful. For example, multi-factor authentication is a security system that requires more than one method of authentication from independent categories of credentials to verify the user's identity for a login. This could include entering a code from the user's smartphone, answering a security question, or providing a biometric indicator such as a fingerprint or facial recognition—in addition to entering a username and password. Thus, even if hackers obtain an employee's username and password, access to the company's system is thwarted because they do not have access to the additional authentication methods.

---

[3] CYBERSECURITY AND INFRASTRUCTURE AGENCY, *Ransomware Guide* (Sept. 2020), https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C_.pdf (last visited Sept. 28, 2023).

34. Similarly, companies housing sensitive data must implement adequate "network segmentation," which is the practice of dividing a larger network into several smaller subnetworks that are each isolated from one another to provide enhanced security. For example, hackers that gain access to an unsegmented network (commonly through phishing) can move laterally across the network to access databases containing valuable assets, such as sensitive personal information or financial records. Malicious lateral movement can be difficult to detect because it oftentimes appears as normal network traffic. By implementing adequate network segmentation, companies can prevent even those hackers who already gained a foothold in their network from moving across databases to access their most sensitive data.

35. Network segmentation is commonly used in conjunction with the principle of least privilege ("POLP"), which is a security practice that limits employees' privileges to the minimum necessary to perform the job or task. In an IT environment, adhering to POLP reduces the risk of hackers gaining access to critical systems or sensitive data by compromising a low-level user account, device, or application.[4] In an example given by security software provider Digital Guardian:

> [A]n employee whose job is to enter info into a database only needs the ability to add records to that database. If malware infects that employee's computer or if the employee clicks a link in a phishing email, the malicious attack is limited to making database entries. If that employee has root access privileges, however, the infection can spread system-wide.[5]

36. This is precisely why approximately 67% of targeted malware and stolen-credential schemes are directed at individual contributors and lower-level management personnel.[6]

---

[4] DIG. GUARDIAN, https://digitalguardian.com/blog/what-principle-least-privilege-polp-best-practice-information-security-and-compliance (last visited Sept. 28, 2023).
[5] Id.
[6] HEALTH IT SEC., https://healthitsecurity.com/news/pharmaceutical-companies-most-targeted-industry-by-cybercriminals (last visited Sept. 28, 2023).

37. In addition to mitigating the risk of stolen credentials, CISA guidance encourages organizations to prevent unauthorized access by:

- Conducting regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;
- Regularly patching and updating software to the latest available versions, and prioritizing timely patching of internet-facing servers and software processing internet data;
- Ensuring devices are properly configured and that security features are enabled;
- Employing best practices for use of Remote Desktop Protocol ("RDP") as threat actors often gain initial access to a network through exposed and poorly secured remote services; and
- Disabling the operating system network file-sharing protocol known as Server Message Block ("SMB"), which is used by threat actors to travel through a network to spread malware or access sensitive data.[7]

38. CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment.[8]

39. Despite being responsible for highly sensitive data, Defendant did not adhere to these best practices. Its implementation of some or all of these measures after the fact is inexcusable given Defendant's knowledge of the sensitivity of the data it was housing, which made it a prime target for cyberattacks.

---

[7] Ransomware Guide, *supra* note 29, at 4.
[8] *Id*. at 5.

40. Legal-services entities like Defendant are prime targets because of the information they collect and store, including intellectual property, proprietary information, and personal information of employees and patients, is extremely valuable on underground markets.

41. A January 2023 article featured in *The American Lawyer* and republished in multiple other online resources stated the "new school of cybercrime has been far more effective at targeting law firms large and small since the onset of Covid-19."

42. Chris Loehr, Executive Vice President of cybersecurity consulting firm Solis Security, stated, "[l]aw firms frequently don't understand how much client and personal data they have until they've been hacked." In the article, Loehr recommends the tracking and disposal of unnecessary data as being "crucial."[9]

43. Defendant observed frequent public announcements of data breaches affecting legal-services entities and knew that information of the type it collected, maintained, and stored was and is highly coveted and a frequent target of hackers. Likewise, a 2019 article published by the American Bar Association stated that more than 100 law firms have report data breaches since 2014.[10]

---

[9] Dan Roe, "Cyberattacks 'Inevitable' for Law Firms, Highlighting Need for Comprehensive Incident Response Plans," *The American Lawyer* (Jan. 10, 2023), https://www.law.com/americanlawyer/2023/01/10/cyberattacks-inevitable-for-law-firms-highlighting-need-for-comprehensive-incident-response-plans/?slreturn=20230210143819 (last visited Sept. 28, 2023).

[10] Debra Cassens Weiss, "More than 100 Law Firms Have Reported Data Breaches; 2 BigLaw Firms Affected," *ABA Journal* (Oct. 18, 2019), https://www.abajournal.com/news/article/more-than-100-law-firms-have-reported-data-breaches-2-biglaw-firms-affected (last visited Sept. 28, 2023).

44. For example, in June 2017, DLA Piper suffered a ransomware attack that prevented its employees worldwide from using firm telephones or email systems while restricting access to certain documents.[11]

45. Further, in 2017, Jenner & Block fell victim to a phishing scheme resulting in the inadvertent sharing of confidential information, including Social Security numbers and salaries.[12]

46. In March 2020, Epiq Global, a legal-services provider, disclosed it had been subjected to a massive ransomware attack where its systems were infected with the TrickBot malware, which is most commonly spread through phishing emails.[13]

47. In May 2020, Grubman Shire Meiselas & Sacks, a firm that offers legal services to the entertainment and media industries, suffered a ransomware attack involving leaked information about a celebrity client. The hackers threatened to release information involving other celebrities; much of the information remains accessible on underground markets.[14]

48. In November 2022, a data breach occurred at the law firm of Cadwalader, Wickersham & Taft whereby an unauthorized party gained remote access to the firm's systems and acquired information from the firm's network. The data breach resulted in the firm having to "wipe firm-issued laptop hard drives" and it "forced many of its internal systems offline."[15]

---

[11] LAW.COM, https://www.law.com/international-edition/2017/06/27/dla-piper-hit-by-cyber-attack-with-phones-and-computers-down-across-the-firm/ (last visited Sept. 28, 2023).
[12] ABA JOURNAL, https://www.abajournal.com/news/article/more-than-100-law-firms-have-reported-data-breaches-2-biglaw-firms-affected (last visited Sept. 28, 2023).
[13] BLEEPING COMPUTER, Lawrence Abrams, "Ryuk Ransomware Attacked Epiq Global Via TrickBot Infection" (Mar. 4, 2020), https://www.bleepingcomputer.com/news/security/ryuk-ransomware-attacked-epiq-global-via-trickbot-infection/ (last visited Sept. 28, 2023).
[14] ARCTIC WOLF, "The Top 10 Legal Industry Cyber Attacks" (July 10, 2023), https://arcticwolf.com/resources/blog/top-legal-industry-cyber-attacks/ (last visited Sept. 28, 2023).
[15] BLOOMBERG LAW, Meghan Tribe, "Cadwalader Hit with Class Action Stemming from Data Breach" (Apr. 12, 2023), https://news.bloomberglaw.com/business-and-practice/cadwalader-hit-with-class-action-stemming-from-data-breach (last visited Sept. 28, 2023).

49. In addition to these cyberattacks targeting the legal industry, Defendant observed numerous well-publicized data breaches involving major corporations in other industries that were targeted given the sensitive consumer information they held. For example, through a series of data breaches extending back to 2013, more than three billion Yahoo! user accounts were compromised when users' names, addresses, and dates of birth were stolen as part of a multi-faceted cyberattack.[16]

50. In separate incidents in 2013 and 2014, hundreds of millions of retail customers were victimized by hacks of payment-card systems at Target and the Home Depot. Both breaches led to rampant payment-card fraud and other damages, to both consumers and the card-issuing banks.[17]

51. In September 2017, credit-reporting agency Equifax announced that hackers stole the personal and financial information of 147 million Americans between May and July 2017.[18]

52. The following year, hotel giant Marriott announced that 383 million guest records were exfiltrated from its hotel guest reservation database over a four-year period.[19]

53. Despite being a holder of highly sensitive information, Defendant failed to prioritize data security by adopting reasonable data security measures to prevent and detect unauthorized access on its network.

---

[16] CNN, Selena Larson, "Every Single Yahoo Account was Hacked – 3 Billion in All" (Oct. 4, 2017), https://money.cnn.com/2017/10/03/technology/business/yahoo-breach-3-billion-accounts/index.html (last visited Sept. 28, 2023).

[17] KREBSONSECURITY, "Home Depot Hit By Same Malware as Target" (Sept. 7, 2014), https://krebsonsecurity.com/tag/home-depot-databreach/ (last visited Sept. 28, 2023).

[18] EQUIFAX, Equifax 2017 Cybersecurity Incident & Important Consumer Information, https://www.equifaxsecurity2017.com/frequently-asked-questions/ (last visited Sept. 28, 2023).

[19] MARRIOTT INT'L, "Marriott Provides Update on Starwood Database Security Incident," (Jan. 4, 2019), https://news.marriott.com/2019/01/marriott-provides-update-on-starwood-database-security-incident/ (last visited Sept. 28, 2023).

54. Defendant had the knowledge and resources to prevent a breach, but neglected to invest adequately in data security, despite the growing number of well-publicized data breaches affecting the legal, and other, industries.

***The Effects of the Data Breach***

55. Given the highly sensitive nature of the PII stolen during the Data Breach, fraudsters across the globe have the ability to commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and putative class members, both currently and on an indefinite, prospective basis.

56. Plaintiff and putative class members have also spent time and money dealing with the Data Breach's fallout, including by checking credit reports, and expending effort searching for unauthorized activity.

57. Further, the impacts of identity theft can have ripple effects, which can adversely affect the future financial trajectories of victims' lives. For example, the Identity Theft Resource Center reports that respondents to their surveys in 2013-2016 described that the identity theft they experienced affected their ability to obtain credit, such as student loans, mortgages, and credit cards.[20]

58. It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. A 2022 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft, including:

- 84% of respondents reported feeling worried or anxious;
- 76% reported feeling violated;

[20] IDENTITY THEFT RES. CTR., *The Aftermath 2017*, https://www.idtheftcenter.org/images/page-docs/Aftermath_2017.pdf (last visited Sept. 28, 2023).

- 65% reported feeling vulnerable;
- 57% reported feeling sad or depressed; and
- 10% reported feeling suicidal.[21]

59. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft, including:

- 90% of respondents reported sleep problems;
- 87% experienced heightened stress;
- 57% reported changes in eating or drinking habits;
- 40% reported new physical illnesses (e.g., aches and pains, heart palpitations, sweating, stomach issues); and
- 23% reported a start or relapse into unhealthy or addictive behaviors.[22]

60. Annual monetary losses from identity theft are well into the billions of dollars. According to a 2007 FTC report on identity theft:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft—for example, health-related or criminal record fraud—face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent

---

[21] IDENTITY THEFT RES. CTR., *2022 Consumer Impact Report*, https://www.idtheftcenter.org/wp-content/uploads/2023/03/2022-Consumer-Impact-Report_V4.1_2023-Update.pdf (last visited Sept. 28, 2023).

[22] *Id.*

> information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[23]

61. The unauthorized disclosure of Social Security numbers can be particularly damaging because they cannot easily be replaced. Furthermore, as the Social Security Administration warns:

> A new number probably will not solve all your problems. This is because other governmental agencies (such as the Internal Revenue Service and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Also, because credit reporting companies use the number, along with other personal information, to identify your credit record, using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you will not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit card information is not associated with the new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[24]

62. The unauthorized disclosure of sensitive personal identifying information to data thieves also reduces the value to its owner, which has been recognized by courts as an independent form of harm.[25]

63. And consumers are injured every time their data is stolen and placed on the dark web—even if they have been victims of previous data breaches. Indeed, the dark web comprises multiple discrete repositories of stolen information that can be aggregated or accessed by different

---

[23] FTC, The President's Identity Theft Task Force, *Combating Identity Theft: A Strategic Plan* (Apr. 2007), at 11, https://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf (last visited Sept. 28, 2023).

[24] SOCIAL SECURITY ADMINISTRATION, *Identity Theft and Your Social Security Number* (July 2021), at 6, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Sept. 28, 2023).

[25] *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp.3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense, thereby fostering an ongoing, and potentially exponential, form of injury.

64. Because of the Data Breach, Plaintiff and putative class members have suffered, and will continue to suffer, economic loss and actual non-economic harms for which they are entitled to damages, including, but not limited to, the following:

a. invasion of privacy via the non-consensual disclosure of confidential information to third parties;

b. diminished value of the PII;

c. the value of the unauthorized access of the PII;

d. diminished value of explicit and implicit promises of data security;

e. costs of fraud related to the theft of the PII;

f. costs, both realized and ongoing, associated with the detection and prevention of identity theft;

g. unauthorized use of financial accounts and costs related thereto;

h. anxiety, emotional distress, and loss of privacy, both realized and ongoing;

i. diminished credit scores resulting from credit inquiries following fraudulent activities; and

j. costs associated with time spent, lost productivity, stress, and reduced enjoyment of life because of the need to identify, monitor, and mitigate realized and likely future consequences of the Data Breach.

65. Even in instances where an individual is reimbursed for a financial loss due to identity theft or related fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement that is not refunded. Likewise,

the DOJ's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" caused by identity theft or associated fraud.[26]

66. There may also be a significant lag between when personal information is stolen and further criminal misuse. According to the GAO, which conducted a study regarding data breaches: "law enforcement officials told us that, in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[27]

67. Plaintiffs and putative class members seek to recover the value of the unauthorized access to the PII permitted by Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret-protected technology.

68. Nevertheless, a plaintiff may generally recover the reasonable-use value of such intellectual property—i.e., a "reasonable royalty"—from an infringer. This is true even though an infringer's use did not interfere with the owner's own use (as in the case of a nonpracticing

[26] U.S. DEP'T OF JUSTICE, Office of Justice Programs, Bureau of Justice Statistics, Erika Harrell, "Victims of Identity Theft, 2014" (revised Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Sept. 28, 2023).

[27] U.S. GOV'T ACCOUNTABILITY OFF., Report to Congressional Requesters: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), http://www.gao.gov/new.items/d07737.pdf (last visited Sept. 28, 2023).

patentee) and even though the owner would not have otherwise licensed such intellectual property to an infringer.

69. A similar royalty or license measure of damages is appropriate here under common-law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and putative class members have a protectible property interest in the PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) that rental value is established with reference to market value—i.e., based on evidence as to the value of similar transactions.

70. Defendant's delayed notice also caused Plaintiff and putative class members harm. By waiting six months to disclose the Data Breach and by downplaying the risk of misuse, Defendant prevented victims from taking meaningful, proactive, and targeted mitigation measures to secure the PII.

71. Although Defendant offered Plaintiff and putative class members the option to activate credit-monitoring services, credit monitoring is reactionary and cannot mitigate the "risk of identity theft" because it is not a preventative tool.

72. Instead, credit monitoring can alert someone to identity theft or fraud *after it has already occurred* so that, hopefully, the harm can be mitigated. Additionally, twelve months of credit monitoring is inadequate as victims will need to monitor their credit profiles for identity theft and fraud indefinitely given the nature of the information stolen.

73. As a result of Defendant's failure to protect the PII with which it was entrusted, Plaintiff and putative class members have been placed at an imminent and ongoing risk of harm from identity theft and identity fraud, requiring them to spend time and money to mitigate the actual and potential impact of the Data Breach.

74. Such efforts include, but are not limited to, initiating "freezes" and "alerts" with credit-reporting agencies, contacting financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring financial accounts and credit reports for unauthorized activity.

75. The way in which Plaintiff's and putative class members' information was stolen confirms that their injuries are concrete. The dispute between Plaintiff and putative class members and Defendant is justiciable now.

76. First, the attack on Defendant was targeted. Defendant has confirmed through its notice that a criminal actor specifically targeted *its* systems. Plaintiff's and putative class members' PII was the target of an intentional criminal act; it did not fall off the back of a truck, so to speak.

77. Second, the information has been misused. As described above, Defendant's intended use of the PII was to support its debt collection business. That criminals now possess Plaintiff's and putative class members' PII following a targeted attack is an inherent, actual, and present *mis*use. The theft itself is a misuse. Stealing a car is a misuse of that car, even if the thieves have not yet sold it to someone else. And, on information and belief, the criminal actors did not steal Plaintiff's and putative class members' PII in order to safeguard it or keep it to themselves; they stole it with the actual, concrete, and imminent intent to effect further misuse.

78. Third, the information at issue is sensitive. There is little information more sensitive than a person's Social Security number, which can act as a "master key" to identity theft. On information and belief, the other financial information at issue in the Data Breach creates additional, present vulnerabilities for Plaintiff and putative class members, who as targets of a debt collection firm are prime targets for identity thieves armed with specific information about Plaintiff's and putative class members' financial obligations.

79. Finally, Defendant continues to hold Plaintiff's and putative class members' PII and, therefore, they have an interest in ensuring that the PII is secured and not subject to further theft.

## CLASS ACTION ALLEGATIONS

80. Plaintiffs seek relief individually and as representatives of all others who are similarly situated. Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), Plaintiffs seek certification of a nationwide class defined as follows:

> **All persons whose PII was compromised as a result of the Data Breach announced by Defendant on or about January 28, 2025 (the "Class").**

81. Plaintiff Deitsch, as a Montana resident at all relevant times, seeks relief individually and as a representative of all persons who meet the following definition:

> **All persons whose PII was compromised as a result of the Data Breach announced by Defendant on or about January 28, 2025, and who were Montana residents at the time of the Data Breach (the "Montana Sub-Class").**

82. Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded are all persons who make a timely election to be excluded from the Class and any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

83. **Ascertainability**. The members of the Class are readily identifiable and ascertainable. Defendant possesses the information needed to identify and contact Class members.

84. **Numerosity** (Fed. R. Civ. P. 23(a)(1)). Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiff at this time,

preliminary information suggests there are thousands of individuals whose PII was compromised in the Data Breach.

85. **Commonality** (Fed. R. Civ. P. 23(a)(2) and (b)(3)). Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual class members. These common questions include, but are not limited to:

a. Whether Defendant knew, or should have known, of the susceptibility of its systems to a data breach;

b. Whether Defendant failed to implement reasonable and adequate security procedures and practices;

c. Whether Defendant's security measures to protect its systems were reasonable in light of known legal requirements;

d. Whether Defendant took adequate measures to protect Plaintiff and class members' PII after evidence of unauthorized access on its network was discovered;

e. Whether Defendant owed a duty to Plaintiff and class members to protect the PII;

f. Whether Defendant breached its duty to protect the PII of Plaintiff and class members by failing to provide adequate data security;

g. Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems and/or the loss of the PII;

h. Whether Defendant had a contractual obligation to use reasonable security measures and whether it complied with such contractual obligations;

i. Whether, as a result of Defendant's conduct, Plaintiff and class members face a significant threat of harm and/or have already suffered harm, and, if so, the appropriate measure of damages to which they are entitled; and

j. Whether, as a result of Defendant's conduct, Plaintiff and class members are entitled to injunctive, equitable, declaratory, and/or other relief, and, if so, the nature of such relief.

86. **Typicality** (Fed. R. Civ. P. 23(a)(3)). Plaintiff's claims are typical of the class members' claims. The rights of Plaintiff and the other class members were violated in a virtually

identical manner as a direct and/or proximate result of Defendant's willful, reckless and/or negligent actions and/or inaction as to the data breach(es). Further, all such claims:

a. Present the same elements and burden of proof;

b. Rely upon Defendant's same course of conduct;

c. Rely upon the same legal arguments; and

d. Rely upon the same methods to measure damages.

87. **Adequacy** (Fed. R. Civ. P. 23(a)(4)). Plaintiff and the undersigned counsel are adequate to represent the Class. Plaintiff will fairly and adequately protect the interests of the class and Plaintiff's counsel are qualified, experienced class-action lawyers who are able to devote the time and resources necessary to represent Plaintiff and the class.

88. **Superiority (**Fed. R. Civ. P. 23(b)(3)). Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy. Further, no unusual difficulties are likely to be encountered in the management of this class action. The primary purpose of the class-action mechanism is to permit litigation against wrongdoers when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant and, thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Similarly, individual litigation by each class member would strain the court system. Individual litigation would also foster the potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class-action structure presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

89. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

90. Likewise, particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and the class members to exercise due care in collecting, storing, and safeguarding the PII;

b. Whether Defendant failed to take reasonable steps to safeguard the PII; and

c. Whether Defendant failed to adequately monitor and audit its data- security systems.

**COUNT I**
**Negligence**
**(*On Behalf of Plaintiff and the Class*)**

91. Plaintiff incorporates here by reference all previous paragraphs as though fully set forth herein.

92. Plaintiff and the putative class provided their PII to the Doe Defendants with the implicit and/or explicit promise that such information would be secured and not divulged.

93. The Doe Defendants in turn provided Plaintiff and class members' PII to Defendant to collect debts on their behalf.

94. Defendant owed a duty to Plaintiff and the class members to safeguard and protect the PII to the full extent of the agreement and promise given by the Doe Defendants.

95. That duty of care arose from Defendant's retention of Plaintiff and the class members' sensitive personal identifying information incident to its collection activities.

96. Defendant breached its duty by failing to exercise reasonable care in safeguarding Plaintiffs and the class members' PII.

97. Defendant also owed Plaintiff and the class members a duty of care to inform them of the Data Breach and attendant risks associated with the breach within a reasonable amount of time of ascertaining the same.

98. It was reasonably foreseeable that Defendant's failure to exercise reasonable care in safeguarding Plaintiff's and the class members' PII would result in an unauthorized party gaining access to such information without a lawful purpose.

99. It was reasonably foreseeable that Defendant's failure to exercise reasonable care in notifying Plaintiff and the class members as to the theft of the PII would handicap their ability to mitigate damages from that theft.

100. As a direct and proximate result of Defendant's conduct, Plaintiff and the class members have suffered, and will continue to suffer, damages including, but not limited to: (i) the unconsented lost value of the PII and loss of control over the same; (ii) non-consensual publication and/or theft of the PII; (iii) out-of-pocket expenses associated with the prevention, detection, and mitigation of injuries from identity theft, tax fraud, and/or unauthorized use of the PII; (iv) costs related to addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports or accounts; (vi) anxiety, emotional distress, loss of privacy, and other non-economic injuries; (vii) ongoing risk to the PII, which remains in

Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it; (viii) the cost of ongoing credit monitoring and identity-protection services necessitated by the Data Breach; (ix) compensation for the reasonable-use value of the PII; and (x) any nominal damages as deemed appropriate.

**COUNT II**
**Negligence *Per Se***
**(*On Behalf of Plaintiff and the Class*)**

101. Plaintiff incorporates here by reference all previous paragraphs as though fully set forth herein.

102. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as DEFENDANT, of failing to use reasonable measures to protect PII. *See* 15 U.S.C. § 45(a)(1).

103. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff and the class members' PII and by failing to comply with applicable industry standards. Defendant's conduct was particularly unreasonable given the sensitive nature of the PII it obtained and stored.

104. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

105. Plaintiff and the class members are within the class of persons that the FTC Act was intended to protect.

106. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures, caused the same type of harm as that suffered by Plaintiff and the class.

107. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the class members have suffered, and will continue to suffer, injuries, damages, and harm as described herein.

**COUNT III**
**Fraudulent Concealment**
**(*On Behalf of Plaintiff and the Class*)**

108. Plaintiff incorporates here by reference all previous paragraphs as though fully set forth herein.

109. Defendant had knowledge of the Data Breach by July 9, 2024, including the knowledge that Plaintiff and the class members were at significant risk of identity theft and related fraud, which they could not otherwise have known or discovered through the existence of reasonable diligence.

110. Defendant had legal and equitable duties to disclose the Data Breach to Plaintiff and the class members within a reasonable timeframe after it learned, or should have known, of the breach.

111. Defendant deliberately failed to communicate this information to Plaintiff and the Class members, attempting to conceal the existence of the Data Breach and attendant risks of harm associated with it.

112. Plaintiff and the class members justifiably relied on Defendant to communicate the existence of the Data Breach and attendant risks of harm associated with it.

113. Plaintiff and the class members were injured by Defendant's failure to communicate this information as they were unable to take actions to prevent and/or mitigate the harms of identity theft and related fraud before they occurred.

114. As a direct and proximate result of Defendant's fraudulent concealment, Plaintiff and the class members suffered injury and sustained actual losses and damages, as described herein. Plaintiff and class members alternatively seek an award of nominal damages.

**COUNT IV**
**Declaratory Judgment**
**(*On Behalf of Plaintiff and the Class*)**

115. Plaintiff incorporates here by reference all previous paragraphs as though fully set forth herein.

116. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those described herein, that are tortious and violate the terms of the state and federal statutes described in this Class-Action Complaint.

117. An actual controversy has arisen in the wake of the Data Breach given Defendant's present and prospective duties under the common law, and other sources of law, to reasonably safeguard the PII.

118. Defendant's misconduct, as described herein, gives rise to a genuine question as to whether it is currently maintaining data-security measures adequate to protect Plaintiff and the class members from further cyberattacks that could compromise their PII.

119. Defendant still possesses the PII, which means it remains at risk of further breach because Defendant's data-security measures remain inadequate. Plaintiff and the class members continue to suffer injuries as a result of the theft of their PII and remain at an imminent risk that further such compromises will occur in the future.

120. Pursuant to the Declaratory Judgment Act, Plaintiff seeks a declaration that: (a) Defendant's existing data-security measures do not satisfy its obligations and duties of care; and (b) in order to comply with its obligations and duties of care, Defendant must: (i) purge, delete, or destroy, in a reasonably secure manner, Plaintiff's and the class members' PII if the PII is no longer necessary to perform essential business functions, so that it is not subject to further theft; and (ii) implement and maintain reasonable, industry-standard security measures, including, but not limited to:

a. engagement of third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing, including simulated attacks, penetration tests, and audits of Defendant's systems on a periodic basis, and ordering it to promptly correct any problems or issues detected by such third-party security auditors;

b. engagement of third-party security auditors and internal personnel to run automated security monitoring;

c. auditing, testing, and training of Defendant's security personnel regarding any new or modified procedures;

d. encryption and segmentation of the PII by, amongst other things, the creation of firewalls and access controls such that, if one area of Defendant's system is compromised, hackers cannot gain access to other portions of the system;

e. purging, deleting, and destroying, in a reasonable and secure manner, PII not necessary to perform essential business functions;

f. conducting regular database scans and security checks;

g. conducting regular employee education regarding best security practices;

h. implementation of multi-factor authentication and POLP to combat system-wide cyberattacks; and

i. conducting routine, continuous internal training and education to inform internal security personnel how to identify, manage, and contain a breach.

**COUNT V**
**Violation of the Montana Consumer Protection Act**
**(*On Behalf of Plaintiff and the Montana Sub-Class*)**

121. Plaintiff, individually and on behalf of the Montana Sub-Class, incorporates here by reference all previous paragraphs as though fully set forth herein.

122. Defendant is a business subject to the Montana Consumer Protection Act.

123. Defendant's conduct in allowing the Data Breach to occur and compromise Plaintiff and class members' PII as well as its reaction to the Data Breach constitute unfair or deceptive acts as encompassed by the Montana Consumer Protection Act.

124. Pursuant to the Montana Consumer Protection Act, in addition to actual damages, Plaintiff and the Montana Sub-Class are entitled to statutory damages equal to the greater of $500 or treble their actual damages.

**COUNT VI**
**Invasion of Privacy by Intrusion upon Seclusion**
**(*On Behalf of Plaintiff and the Class*)**

125. Plaintiff incorporates here by reference all previous paragraphs as though fully set forth herein.

126. Defendant is a debt collector who was collecting a debt on behalf of a different creditor named here as a Doe Defendant. The Doe Defendants are credit card companies or other creditor entities which provided Defendant with Plaintiff and the class members' PII.

127. Plaintiff and the class members' PII is a private subject matter not ordinarily apparent to the public.

128. Plaintiff and the other class members have a right to keep their PII safeguarded and to choose when and to whom that information may be shared, if it all.

129. By virtue of Defendant's failure to safeguard and protect this PII, Defendant wrongfully intruded upon Plaintiff's and the class members' seclusion by allowing criminal actors to access their PII.

130. Because of the nature of Plaintiff's and the other class members' PII, the access to their private information intruded upon and invaded their privacy in general, and also negatively affected their ability to keep their PII private now and in the future.

131. The conduct of Defendant, as described in detail above, including allowing criminal actors to access Plaintiff's and the class members' PII, was unreasonable and/or highly offensive.

132. Plaintiff and the class members suffered, will continue to suffer, and are reasonably certain to suffer damages as a direct and/or proximate result of Defendant's failure to secure and protect their PII in the form of expenses for adequate credit monitoring and identity theft insurance, out-of-pocket expenses, such as costs for placing or removing a credit freeze, loss of privacy, deprivation of the value of their PII, and other economic and non-economic harm for which they are entitled to compensation.

## **PRAYER FOR RELIEF**

133. WHEREFORE, Plaintiff, individually and on behalf of members of the class and sub-classes, as applicable, respectfully request the Court enter judgment in their favor and against Defendant in the form of:

a. An order certifying the class and sub-classes, as defined herein, and appointing Plaintiff as class representative and appointing the undersigned counsel as lead counsel for the class;

b. Equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff and the class members' PII;

c. Equitable relief compelling Defendant to use industry-standard security methods and policies with respect to data collection, storage and protection, and sharing of

information, and to dispose of Plaintiff's and the class members' PII that is not necessary to perform essential business functions;

d. An award of compensatory, consequential, and general damages in an amount to be determined at trial;

e. An award of statutory, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

f. An award of attorneys' fees, costs, and litigation expenses, as allowable by law;

g. Pre-judgment interest on all amounts awarded; and

h. Such other and further relief as this court may deem just and proper.

**JURY DEMAND**

134. Plaintiff demands a jury trial on all claims so triable.

**DESIGNATION OF PLACE OF JURY TRIAL**

Plaintiffs designate Kansas City, Kansas as the place for this case to be tried to a jury.

Dated: February 10, 2025

Respectfully submitted,

/s/ *Jenilee V. Zentrich*
Bryce B. Bell KS # 20866
Jenilee V. Zentrich KS # 29098
**BELL LAW, LLC**
2600 Grand Blvd., Suite 580
Kansas City, Missouri 64108
Tel: 816-886-8206
Bryce@BellLawKC.com
JZ@BellLawKC.com

John Heenan
**HEENAN & COOK**
1631 Zimmerman Trail
Billings, Montana 59102
Tel: 406-839-9091
john@lawmontana.com

(Pro Hac Vice forthcoming)

Raph Graybill
**GRAYBILL LAW FIRM**
Helena, Montana
raph@graybilllawfirm.com

(Pro Hac Vice forthcoming)

*Attorneys for Plaintiffs and the Proposed Classes*